# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **GARY W. HAMM and LINDA M. HAMM,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 3:19-cv-00426** |
| **WYNDHAM RESORT DEVELOPMENT CORP., WYNDHAM WORLDWIDE OPERATIONS, INC., WYNDHAM VACATION RESORTS, INC., WYNDHAM VACATION OWNERSHIP, INC., WYNDHAM CONSUMER FINANCE, INC., WYNDHAM REWARDS, INC., and JOHN DOES 1–100,** | ) ) ) ) ) ) ) ) ) ) ) | **Judge Aleta A. Trauger** |
| **Defendants.** | ) | |

## MEMORANDUM

Before the court is the plaintiffs' Motion for Leave to Amend Complaint, filed along with the proposed Amended Complaint. (Doc. Nos. 19, 19-1.) The defendants, collectively, oppose the motion. (Doc. No. 26.) For the reasons set forth herein, the Motion to Amend will be granted in part and denied in part.

## I.    PROCEDURAL BACKGROUND

Plaintiffs Gary Hamm and Linda Hamm filed suit on May 20, 2019, invoking the court's diversity jurisdiction and asserting claims under Tennessee law for (1) fraud; (2) fraudulent misrepresentation; (3) fraudulent inducement; (4) misrepresentation by concealment; (5) negligent misrepresentation; (6) violation of the Tennessee Timeshare Act ("TTSA"), Tenn. Code Ann. § 66-32-101 *et seq.*; (7) breach of contract; and (8) unjust enrichment. (Doc. No. 1.) All claims were

asserted against all defendants, who are identified as Wyndham Resort Development Corp., Wyndham Worldwide Operations, Inc., Wyndham Vacation Resorts, Inc.,[1] Wyndham Vacation Ownership, Inc., Wyndham Rewards, Inc. (collectively "Wyndham" or "Wyndham defendants"), and "John Does 1–100," who are alleged to be individuals employed by one or more of the Wyndham defendants. Very generally, the plaintiffs' claims were premised upon their purchase of timeshare properties and points for resort properties located in Tennessee and Virginia.

In lieu of an answer, the Wyndham defendants sought dismissal of the original Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that (1) the claims of fraud, fraudulent misrepresentation, fraudulent inducement, misrepresentation by concealment, and negligent misrepresentation were barred by the three-year statute of limitations set out in Tenn. Code Ann. § 28-3-105; (2) the terms of the parties' written agreements negated the fraud-based claims; (3) the fraud-based claims were not pleaded with sufficient particularity; (4) the plaintiffs' allegations in support of their fraud and misrepresentation claims were contradicted by the merger and integration clauses of the written timeshare contracts the plaintiffs executed and also by the plain terms of those agreements; (5) the Complaint failed to allege facts showing a specific breach of any agreement and therefore failed to state a claim for breach of contract; and (6) the claim for unjust enrichment was subject to dismissal as a matter of law since the parties' relationship is governed by express written contracts. (Doc. Nos. 6, 7.)

On November 25, 2019, the court granted the defendants' Motion to Dismiss, finding that (1) the fraud claims, including the TTSA claim, were not pleaded with the particularity required by Rule 9 of the Federal Rules of Civil Procedure; (2) the negligent misrepresentation claim was

---

[1] The court erroneously noted, in the Memorandum entered on November 25, 2019, that Wyndham Vacation Resorts, Inc. was not named as a defendant. (*See* Doc. No. 15, at 10 n.2.) It is clearly named as a defendant.

time-barred; and (3) the Complaint failed to allege facts to support the plaintiffs' breach of contract and unjust enrichment claims. (Doc. Nos. 15, 16.) All claims, however, were dismissed without prejudice, and the court expressly granted the plaintiffs the option of filing a motion to amend their pleading along with a copy of an amended complaint that cured the deficiencies in the original Complaint.

The plaintiffs have now filed their Motion for Leave to Amend Complaint and proposed Amended Complaint. (Doc. Nos. 19, 19-1.) The Wyndham defendants oppose the Motion to Amend on the grounds of futility, arguing that the proposed Amended Complaint would be subject to dismissal on largely the same grounds as those raised in the Motion to Dismiss aimed at the original Complaint. (Doc. No. 26.) Specifically, they argue that: (1) the fraud claims are still not pleaded with the particularity required by Rule 9; (2) the fraud-based claims are barred by the statute of limitations; (3) the proposed Amended Complaint makes no effort to revise the factual allegations supporting the negligent misrepresentation, breach of contract, or unjust enrichment claims, so there is no basis for reinstating these claims. The plaintiffs did not seek leave to file a reply brief.

## II.     NEW FACTUAL ALLEGATIONS

In the Memorandum entered on November 25, 2019 (Doc. No. 15), the court summarized fairly comprehensively the plaintiffs' factual allegations in the original Complaint and will not restate all of those allegations here. Very generally, the plaintiffs there and in the proposed Amended Complaint allege that, over the course of several decades, beginning in the 1980s, they purchased Wyndham timeshares and vacation-club membership points and/or properties and signed timeshare contracts in Virginia and Tennessee; that they were continuously pressured by Wyndham employees to purchase additional points and/or properties; that Wyndham employees, pursuant to their training, intentionally and/or negligently misled the plaintiffs, through

affirmatively untrue statements or fraudulent omissions, to induce them to stay in a relationship with Wyndham and to increase their stake; and that Wyndham employees misled them as to the value of their purchases, the costs associated with them, whether the purchases were a sound financial investment, and whether the plaintiffs would be able to sell their points and properties.

In dismissing the fraud claims set forth in the original Complaint for failure to allege the facts supporting the claims with the requisite particularity, the court found that the plaintiffs failed to allege when or where the allegedly fraudulent conduct took place or who made the actionable statements and omissions. In the proposed Amended Complaint, the plaintiffs now specify that they purchased Wyndham timeshares and signed timeshare contracts in Williamsburg, Virginia on September 28, 2014 and May 21, 2015. They purchased the "Pathways" program on September 28, 2014. (Doc. No. 19-1 ¶ 2.) They purchased Wyndham resort vacation units at Wyndham resorts located in Tennessee. (*Id.* ¶ 3.)

The proposed Amended Complaint identifies the various defendants but still does not indicate the basis for the plaintiffs' decision to sue all of them as if they comprise a single entity. Wyndham Resort Development Corp. ("WRDC") operates under the name "WorldMark by Wyndham" and is registered to conduct business in Tennessee. (*Id.* ¶ 4.) The plaintiffs do not allege what business WRDC is engaged in or what, if any, contact the plaintiffs had with WRDC. Wyndham Worldwide Operations, Inc. is, and has at all material times been, in the "hospitality business, franchising and managing hotels through the United States" and "control[ing] the acts and practices of its subsidiaries." (*Id.* ¶ 5.) The plaintiffs do not allege that they had any contacts or communications with WWO and only imply that it is a remote parent of the entity they did deal with—Wyndham Vacation Resorts, Inc. ("WVR").

The plaintiffs entered into timeshare contracts with defendant WVR. (*See id.* ¶ 10; Doc. Nos. 7-1, 7-2, 7-3.) Wyndham Vacation Ownership, Inc. is the direct parent company of WVR. (Doc. No. 19-1 ¶ 7.) Wyndham Rewards, Inc. operated Wyndham Rewards, "a mechanism regarding timeshare maintenance fee, as part of Defendants' transaction(s) with Plaintiffs." (*Id.* ¶ 8.) Beyond stating that they contracted with WVR and participated in the Wyndham Rewards program, the plaintiffs do not explain the basis for their suit against the other Wyndham defendants. Instead, they allege broadly that "the corporate structure [of the various Wyndham entities] is unknown to Plaintiffs and will have to be clarified through discovery." (*Id.* ¶ 10.)

The plaintiffs allege that the John Doe defendants are employees of one or more of the Wyndham defendants. (*Id.* ¶ 9.) The plaintiffs do not know the names of each sales representative with whom they dealt, nor do they name as defendants the three whose names they do remember, Orlando Vincent, Shauntae Covington,[2] and Lori Lewis. (*Id.* ¶¶ 44, 102.) They believe the sales representatives are employed by WVR, but "that information is not within Plaintiff[s'] knowledge but is within Defendants' knowledge." (*Id.* ¶ 44.)

The plaintiffs alleged very generally in the original Complaint that "Wyndham" engaged in "bait and switch" tactics and advertising, made false or misleading statements to them, and engaged in multi-hour long, high-pressure sales tactics. These same allegations in the proposed Amended Complaint are now prefaced with the phrase, "[i]n each sales presentation." (*Id.* ¶¶ 49–54, 56, 59–61, 70–75, 83–84, 87–94, 97.) The proposed Amended Complaint also includes a new section in which the plaintiffs provide some chronological background. They allege that, in the 1980s, they participated in a promotional two-night stay at a Wyndham property, Fairfield Glade,

---

[2] The Amended Complaint includes several spellings of Covington's first name. The sales documents attached to the defendant's Motion to Dismiss spell it "Shauntae." (*See, e.g.*, Doc. No. 7-3, at 14, 22, 40.)

and, after that stay, purchased a "fixed-week timeshare" at that property for $4,600. They were told that this was an investment the value of which would increase over time and that the plaintiffs would save money on future vacations. The maintenance fee then was $80 per year. The plaintiffs allege that they were not told about assessment fees or that the maintenance fees could increase; they were not told about other fees like programming and booking fees. However, the maintenance fee increased to $298 in 2001 and then to $1,092 in 2006 because of an assessment for a new pool, gym, and other amenities. The fee was $699 in 2012. The plaintiffs assert that "[n]on-owners could easily reserve a Wyndham place and time for a week for about $300; however, Plaintiffs were required to pay high fees and assessments on top of the purchase price." (Doc. No. 19-1 ¶ 98.)

Despite the fact that the maintenance and assessment fees started going up in 2001, the plaintiffs allege that they did not yet realize that they were being defrauded, because "Wyndham representatives engaged in a systematic policy of concealing any wrongdoing by repeated[ly] explaining that Plaintiffs['] complaints could be resolved if they upgraded or made other financial contributions to change the ownership program they had into a new, different and more expensive one." (*Id.* ¶ 99.)

In November 2008, the plaintiffs attended a sales presentation in Nashville while they were on a Wyndham "3-day, 2-night get-away gift." (*Id.* ¶ 100.) This included a ninety-minute sales presentation and tour of a Wyndham property. At this presentation, the plaintiffs complained about the Fairfield Glade maintenance fees and their problems exchanging weeks because the company had moved to a "points system." (*Id.*) The unknown sales representative told the plaintiffs that he could fix all these problems if the plaintiffs would just purchase an additional 182,000 points, which would give them Club Wyndham Access "where the fees would be blended and Plaintiffs would have points," putting the plaintiffs in "a group of timeshares." (*Id.*) The sales representative

put their 182,000 points into Ocean Blvd which has one of the highest maintenance fees and the remaining 77,000 still stayed with the Glade. Plaintiffs were now paying maintenance fees of $890/year for Ocean Blvd and still paying an additional $699 for the Glade. Plaintiffs thought they were going to have a fixed-location ownership in Nashville as that was the place Plaintiffs viewed. Plaintiffs were never told about buying into Ocean Blvd, a place Plaintiffs never saw or heard of. This practice of covering up prior fraudulent misrepresentations with further misrepresentations exemplifies Wyndham's practice of concealing fraud from Plaintiffs by making them think that their "problems" are fixed or fixable.

(*Id.* ¶ 100.)

The plaintiffs assert that, when they booked a week's vacation in June 2014, they were told they would have to pay $4 per person per day to use such facilities as the pool and the gym. They claim that they had never been told during the presentation that they would have to pay such fees. (*Id.* ¶ 101.)

In September or October 2014, [3] the plaintiffs went to Williamsburg, Virginia for a vacation at Governor's Green. They were told they would "get their gifts" if they attended a breakfast and ninety-minute presentation. (*Id.* ¶ 102.) They did those things, but then were told by salesperson Orlando Vincent that they could not "get their gifts" unless they also met with him. (*Id.*) The plaintiffs apparently explained to Vincent their ongoing complaints about maintenance fees and other costs, because they allege that Vincent told them that

he could fix the maintenance fees problem and help them with an exit plan. Plaintiffs had to buy 141,000 more points [with Governor's Green] to put them into Club Wyndham Access, which Plaintiffs understood to be a group of blended timeshares. . . . Plaintiffs were also sold the Pathways Program. This is basically a buyback program where Plaintiffs were told that Wyndham would buy back their timeshare after a period of time. Plaintiffs were told that, after 5 years, Plaintiffs could opt out of Wyndham and get 20% of their invested money returned. Mr. Vincent and [sales representative Shauntae] Covington even did the math in front of Plaintiffs to show them what the 20% would be applied to. Plaintiffs met with

---

[3] The plaintiffs actually claim that this particular presentation and purchase took place both on September 28, 2014 and some time in October 2014. Based on the agreements attached as exhibits to the defendants' Motion to Dismiss, dated September 28, 2014 (Doc. No. 7-2), the court presumes that the reference to October is an error.

> Lori Lewis, the Quality Assurance Officer and she confirmed what they said. Maintenance fees were then $200/month or $2400/year and Plaintiffs owned 400,000 points. This is more than Plaintiffs could realistically use but it was important to Plaintiffs to have an exit plan. Plaintiffs spent approximately three hours in these meetings. Plaintiffs were never told that Wyndham had an option to refuse to buy back their timeshare.

(*Id.* ¶ 102.) The plaintiffs claim again that the defendants "concealed fraud with more fraudulent misrepresentations." (*Id.*)

The plaintiffs took another vacation to Williamsburg in May 2015, where they were "coerced into another sales presentation," although this one was couched as an "owner satisfaction update." (*Id.* ¶ 103.) They met again with Shauntae Covington and Orlando Vincent, who told them that if they went up to 500,000 points, they could "book their vacations into Extra Vacations and recoup some of their maintenance fees." (*Id.* ¶ 103.) They also "confirmed that Wyndham was still bound by the 5-year, 20% buyback program." (*Id.*) The plaintiffs, relying on the representations by Covington and Vincent "guarantee[ing]" that Wyndham would buy back the timeshare, went along with this plan, bumping up their total points to 505,000 and their annual maintenance fees to $3,202. (*Id.*) The plaintiffs were both already retired at this time, and their annual income was around $25,000. (*Id.* ¶ 104.) They were persuaded by Wyndham representatives to falsify their income on their loan application by claiming it was higher, in order to qualify for this transaction. (*Id.* ¶ 104.)

The plaintiffs' most recent vacation was June or July 2018. When they took this vacation, they were again "required to pay fees and assessments that non-owners were not required to pay." (*Id.* ¶ 105.)

The plaintiffs claim that they have been "Wyndham timeshare owners for a long time" and "believed Wyndham was an honest company and that its salespeople were honestly trying to help Plaintiffs get into an ownership program that best met their needs." (*Id.* ¶ 106.) They assert that

they had no duty to investigate whether the Wyndham salespeople were engaging in fraud and that the salespeople were "affirmatively concealing" the fraud "by repeatedly selling Plaintiffs a new product allegedly designed to improve their ownership situation." (*Id.*) They assert that "Wyndham and its salespeople failed to disclose material facts . . . despite a duty to do so," and their "smoke and mirrors tactics were specifically designed to hide Wyndham's deceit." (*Id.*) Specifically, Wyndham and its salespeople "used these periodic 'upgrades' and 'improvements' as a device to mislead Plaintiffs in order to exclude suspicion of wrongdoing." (*Id.*)

Finally, the plaintiffs claim that they did not learn until May 2019 that "Wyndham had the option to opt out of the Pathways Program and did not have to buy back [their] timeshare." (*Id.* ¶ 107.) Only then did the plaintiffs begin to realize that the Wyndham salespeople may not have had the plaintiffs' best interests in mind when they repeatedly upsold the plaintiffs. (*Id.*) They began at that point to do some research online and learned that other consumers were having the same problems with Wyndham. (*Id.*)

## III.    STANDARD OF REVIEW

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend shall be freely granted when justice requires. Leave should generally be granted under Rule 15(a) unless there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (citation omitted).

## IV.    ANALYSIS

### A.    Fraud Claims

The proposed Amended Complaint again sets forth "Counts" or causes of action for fraud, fraudulent misrepresentation, fraudulent inducement, and misrepresentation by concealment (or fraudulent omission), as well as a claim for violation of the TTSA.

In their Response in Opposition to the Motion to Amend, the defendants acknowledge that the proposed Amended Complaint "attempts to correct some deficiencies, particularly as it relates to the fraud-based claims," but they nonetheless contend that the proposed amendment fails to add the requisite particularity and is therefore futile. (Doc. No. 26, at 2.) Specifically, the defendants argue that the fraud-based claims still lack the particularity required by Rule 9 of the Federal Rules of Civil Procedure. They also argue that, regardless of whether they are adequately pleaded, the common-law fraud claims are barred by the applicable statutes of limitation.

In addressing the Motion to Amend, because the defendants largely rely on the arguments previously made in their Memorandum in Support of the Motion to Dismiss and because the plaintiffs did not seek leave to file a reply brief in support of their Motion to Amend, the court has considered the parties' filings and arguments in support of, and opposition to, the original Motion to Dismiss.

### 1.    *Rule 9*

Rule 9 provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The court previously concluded that this standard applies to the plaintiffs' TTSA claims, and it unquestionably applies to all of the plaintiffs' other fraud-based claims. (*See* Doc. No. 15, at 8, 12.)

As the court stated previously, Rule 9 requires a plaintiff: "(1) to specify the allegedly fraudulent statements; (2) to identify the speaker; (3) to plead when and where the statements were

made; and (4) to explain what made the statements fraudulent." *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012) (citation omitted). When pursuing fraud claims against multiple defendants, the plaintiff typically must make "specific allegations as to each defendant's alleged involvement." *N. Port Firefighters' Pension–Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 773 (M.D. Tenn. 2013) (Haynes, C.J.). That is, mere "'group pleading' . . . fails to meet . . . [Rule] 9(b)'s specificity requirements." *D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 730 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005).

In their Motion to Dismiss the original Complaint, the defendants conceded that the plaintiffs adequately alleged fraudulent statements but argued that they failed to supply the who, where, or when of each purportedly fraudulent statement. The court agreed. In dismissing the fraud claims in the original Complaint for lack of particularity, the court acknowledged that, because fraud may involve subterfuge and misdirection that leave a victim in the dark about many of the details of a scheme, even after he realizes he has been defrauded, "Rule 9(b)'s particularity requirement may be relaxed when certain information is solely within the defendant's knowledge." *Traxler v. PPG Indus., Inc.*, 158 F. Supp. 3d 607, 630 (N.D. Ohio 2016) (citation omitted). Nonetheless, besides finding that the original Complaint utterly failed to allege the when or where of the alleged fraud, the court also observed that the plaintiffs had made no effort to distinguish among the various Wyndham entities, to allege which entities employed the sales representatives with whom the plaintiffs interacted, or to explain the source of their confusion regarding the entity or entities with which they dealt. They also did not "allege facts suggesting a blurring of corporate formalities or providing a basis for liability on the part of the parent or sibling corporations of the entity or entities with which they had dealings." (Doc. No. 15, at 10.)

The proposed Amended Complaint has attempted to remedy the identified deficiencies by supplying the "who," "when" and "where" of the purported fraudulent misrepresentations and omissions. The plaintiffs allege that they signed timeshare contracts in Nashville, Tennessee on November 14, 2008 and in Williamsburg, Virginia on September 28, 2014 and May 21, 2015 and purchased the "Pathways program" in Williamsburg on September 28, 2014. They claim that the alleged misrepresentations occurred during the sales presentations they attended on those days. They do not allege that they sat through any other sales presentations or entered into more recent agreements with "Wyndham." Thus, for all of the paragraphs in the proposed Amended Complaint that begin, "In each sales presentation" (¶¶ 49–54, 56, 58–63, 70–75, 83–84, 87–94, 97), the court understands the Amended Complaint to be referencing the sales presentations that took place in connection with the sales in Nashville, Tennessee and Williamsburg, Virginia on November 14, 2008, September 28, 2014 and May 21, 2015. The "where" and "when" of the alleged fraud, therefore, are now alleged with sufficient particularity.

The plaintiffs attempt to satisfy the "who" requirement as well. They state that they do not recall the name of the sales representatives they met with in 2008. They interacted with Shauntae Covington, Orlando Vincent, and Lori Vincent during the September 2014 presentation; they dealt with Covington and Vincent again in May 2015, but they do not remember the names of all the individuals "who transacted business with Plaintiffs." (*Id.* ¶ 44.) The plaintiffs allege that they believe Covington and Vincent worked for WVR.[4] This makes sense, because one of the Disclosures the plaintiffs signed documents their acknowledgment that "O. Vincent / S. Covington

---

[4] Other individual representatives are identified on the contract documents filed by the defendants. It is unclear why the plaintiffs do not reference these individuals or name any of them, including Vincent, Covington, and Lewis, as defendants and, instead, name only "John Does 1–100."

of Wyndham Vacation Resorts represents [sic] the Seller in this real estate transaction" (Doc. No. 7-2, at 22), and the seller is identified as WVR. In addition, virtually all of the contract documents supplied by the defendants in connection with the Motion to Dismiss were executed by and between the plaintiffs and WVR. (*See* Doc. Nos. 7-1, 7-2, 7-3.)[5] The proposed Amended Complaint alleges that the sales representatives, in making the alleged misrepresentations, acted in accordance with corporate policy and that the Wyndham defendants are responsible for the fraudulent, intentional, and negligent acts of their employees under the doctrine of *respondeat superior*. (Doc. No. 19-1 ¶¶ 18, 43.) Based on these allegations and the information supplied by

---

[5] The September 28, 2014 timeshare purchase agreement is expressly between the plaintiffs and WVR. (*See* Contract Agreement and Installment Note, Doc. No. 7-2, at 1–3.) As part of that transaction, the plaintiffs also agreed to pay an annual "CLUB WYNDHAM Plus Assessment" (*id.* at 1) and became members of Pathway by Club Wyndham (*see id.* at 6 ("Buyer's Acknowledgment")). One associated document has a header "Wyndham Vacation Ownership, Inc. Quality Assurance Checklist," but it is not an agreement and was not signed by the plaintiffs. (*Id.* at 7.) The plaintiffs also entered into a Club Wyndham Enrollment Agreement with WVR as "Sponsor," as part of which they acknowledged that WVR was a subsidiary of Wyndham Worldwide Corporation but operated as an independent company. (*Id.* at 17, 18.) Regardless of whether Wyndham Worldwide Corporation and defendant Wyndham Worldwide Operations, Inc. are, in fact, the same entity, neither of them is a party to the agreement. The Club Wyndham "Program Rules" are promulgated by Wyndham Fulfillment Group, LLC (*id.* at 24), but that entity is not among the defendants. The plaintiffs also submitted an application for a Wyndham Rewards Visa card and signed a Credit Authorization in favor of Wyndham Vacation Ownership, Inc. (*id.* at 48, 51), but these documents do not appear to be implicated by any of the factual allegations in the proposed Amended Complaint.

Pursuant to the Security Agreement executed in May 2015, the plaintiffs purchased from WVR a membership interest ("Ownership") in "PTVO Owners Association, Inc., a non-stock, non-profit Delaware corporation . . . , which Ownership includes the right to participate in the Club Wyndham Access Vacation Ownership Plan ('Club')," for $76,761.00, with the associated rights designated in "Points." (Doc. No. 7-3, at 1.) By making this purchase, the plaintiffs were allocated 505,000 annual "Points," which, under the Agreement, they were entitled to use to reserve accommodations in the Club. (*Id.*) As they had in 2014, the plaintiffs signed an Enrollment Agreement again acknowledging that WVR is a subsidiary of Wyndham Worldlide Corporation (*id.* at 22), and they received a copy of the Wyndham Rewards Program Rules promulgated by Wyhdham Fulfillment Group, LLC (*id.* at 33). This packet of documents also includes a document titled "Wyndham Vacation Ownership, Inc. Quality Assurance Checklist," but it, again, is not an agreement and was not signed by the plaintiffs. (*Id.* at 39.)

the contract documents themselves, the court finds that the plaintiffs have adequately alleged that WVR is responsible for the purported misrepresentations made by its employees during sales presentations.

However, while the plaintiffs may have provided a viable basis for suing WVR, they have not articulated any basis for suing any other Wyndham entity. They claim only that the corporate structure of the Wyndham defendants is unknown to them and that they are unsure whether the various sales representatives might have worked for more than one entity. Their speculation in that regard does not mitigate the fact that the proposed Amended Complaint itself contains no allegations suggesting that they had dealings directly with any entity other than WVR, that they entered into contracts with any other named defendant, or that any other entity could be responsible for the alleged misrepresentations. As was true of the original Complaint, the proposed Amended Complaint makes no attempt to explain the source of the plaintiffs' confusion regarding the identity of the entity or entities with which they dealt or to "allege facts suggesting a blurring of corporate formalities or providing a basis for liability on the part of the parent or sibling corporations of the entity or entities with which they had dealings." (Doc. No. 15, at 10.)

In sum, the court finds that the proposed amendment does not comply with Rule 9 and would be futile insofar as it continues to name as defendants any Wyndham entity other than WVR. Specifically with respect to WVR, the proposed amendment does adequately allege the who, when, and where of the allegedly fraudulent misrepresentations, as required by Rule 9.

### 2.     *Statute of Limitations*

The defendants also maintain that, even if adequately pleaded for purposes of Rule 9, the fraud-based claims in the proposed Amended Complaint are barred by the three-year statute of limitations that pertains to the common-law fraud claims. They acknowledge that the TTSA incorporates a four-year statute of limitations, *see* Tenn. Code Ann. § 66-32-119, which would not

bar claims arising from misrepresentations made in May 2015, but they claim that any TTSA claims arising from prior alleged misrepresentations would be barred. In addressing the defendants' Motion to Dismiss the original Complaint, the court did not reach the statute of limitations question, having found that dismissal on the grounds of Rule 9 was warranted.

The statute of limitations is an affirmative defense, Fed. R. Civ. P. 8(c), and "a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (citing Fed. R. Civ. P. 8(a); *Jones v. Bock*, 549 U.S. 199, 216 (2007)). Thus, "a motion under Rule 12(b)(6) . . . is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations." *Id.* When, however, the allegations in the complaint affirmatively show that a claim is time-barred, dismissing the claim under Rule 12(b)(6) may be appropriate. *Id.*; *see also Jones*, 549 U.S. at 215 ("If the allegations . . . show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim[.]").

"Because the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run," and "[i]f the defendant meets this requirement then the burden shifts to the plaintiff to establish an exception to the statute of limitations." *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir.2001). To prevail on this affirmative defense, a defendant must prove both that (1) the statute of limitations has run and (2) no genuine issue of material fact exists as to when plaintiff's cause of action accrued. *Id.* If the defendant meets this burden, the burden then shifts to the plaintiff to establish an exception to the statute of limitations. *Id.* The nonmoving party may not rest on the mere allegations in the pleadings. *Id.* However, if the defendant fails to meet its burden of proof, the plaintiff has no obligation to proffer

additional evidence to rebut the statute of limitations defense. *Fonseca v. Conrail*, 246 F.3d 585, 590–91 (6th Cir. 2001).

In this case, the plaintiffs filed the original Complaint on May 20, 2019. The plaintiffs do not dispute that their fraud-based claims are subject to the three-year statute of limitations set forth in Tenn. Code Ann. § 28-3-105. (*See* Doc. No. 7, at 7; Doc. No. 13, at 2–9.) The defendants argued in their Motion to Dismiss that the plaintiffs' common law fraud claims are barred because the facts as alleged by the plaintiffs (and as substantiated by the written agreements) show that the most recent contracts were executed, and the most recent misrepresentations and omissions were made, on May 21, 2015, almost four years before the filing of the Complaint on May 20, 2019. They argued that the alleged falsity of the statements on which the plaintiffs allegedly relied was or should have been obvious upon a "cursory review of the Agreements and accompanying documents." (Doc. No. 7, at 11.) The defendants cite to Tennessee law under which a party who signs a contract without reading it is "presumed to know the contents" thereof and "must suffer the consequences of his own negligence." *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 369 (Tenn. Ct. App. 2001). Thus, according to the defendants, upon signing the agreements, the plaintiffs were put on notice of their terms, and, therefore, the claims are time-barred. The defendants also pointed to the merger and integration clauses incorporated into the agreements, which expressly disclaim reliance on any representations and warranties, written or oral, that are not incorporated into the final written agreements, and they argued that the plaintiffs should be prevented from introducing parol evidence to vary or contradict the unambiguous terms of the agreements. In sum, they maintained that the plaintiffs were unreasonable in relying on any alleged misrepresentations insofar as they conflicted with the clear written terms of the agreements. In their Response in Opposition to the Motion to Amend, the defendants rely on their previous filing

and simply assert that the proposed amendment is futile because "[a] reasonable person should have been on notice of the alleged fraud-based claims shortly after the signature of the 2015 Agreement" and because the plaintiffs' "bare allegations of fraudulent concealment cannot toll the three year statute of limitations for the fraud-based claims." (Doc. No. 26, at 5.)

In responding to the Motion to Dismiss, the plaintiffs argued that their claims are not time-barred because the statutes of limitation either did not accrue until "recently" or were tolled by the doctrine of fraudulent concealment. Specifically, they claimed that the Complaint:

> outlines a systematic policy of training and practice that involves misrepresentations, omissions and deceit by Wyndham against Plaintiffs. Plaintiffs are repeatedly lured into "ownership satisfaction" or "ownership update" meetings that in reality are sales presentations to purchase or upgrade timeshare ownership. Defendants mask the true purpose of the meetings in order to fraudulently conceal the illegal conduct of Defendants. Plaintiffs remain unaware of the illegal conduct because they are fraudulently led to believe that one more upgrade is all that is needed to secure the product they were promised.

(Doc. No. 13, at 5.) The plaintiffs further insisted that, although they were familiar with timeshare ownership, they

> made reasonable efforts to improve their ownership situation by doing due diligence during ownership meetings. Defendants have, however, systematically misrepresented or omitted facts in order to deceive Plaintiffs and fraudulently conceal their illegal activity. This fraudulent concealment has prevented Plaintiffs from acquiring knowledge of facts sufficient to put a reasonable person on notice that he or she has suffered an injury as a result of wrongful conduct.

(*Id.* at 8.)

The proposed Amended Complaint reflects that the plaintiffs' primary concern, aside from increasing maintenance and other fees and less booking flexibility than they expected, is that, when they entered into the "Pathways Program" agreement with WVR in September 2014, they were specifically

> told that Wyndham would buy back their timeshare after a period of time. Plaintiffs were told that, after 5 years, Plaintiffs could opt out of Wyndham and get 20% of

> their invested money returned. Mr. Vincent and Ms. Covington even did the math in front of Plaintiffs to show them what the 20% would be applied to. Plaintiffs met with Lori Lewis, the Quality Assurance Officer and she confirmed what they said. . . . [I]t was important to Plaintiffs to have an exit plan. . . . Plaintiffs were never told that Wyndham had an option to refuse to buy back their timeshare. Once again, Wyndham concealed its fraud with more fraudulent misrepresentations.

(Doc. No. 19-1 ¶¶ 2, 102.)

On May 21, 2015, the plaintiffs were again assured that "Wyndham was still bound by the 5-year, 20% buyback program," and Covington "guarantee[d]" that Wyndham would buy back the plaintiffs' timeshare. (*Id.* ¶ 103.) The plaintiffs allege that they wrote on one of the forms associated with the new purchase in May 2015 that one of the top three reasons for adding new points was that "Wyndham would buy back our contracts after 5 years for 20%." (*Id.*) An unknown sales manager persuaded the plaintiffs to change this language to "Better resale value in future" in order to conceal the fact that "Wyndham [could] opt out of the Pathways Program by refusing to buy back their timeshare." (*Id.*) However, in "May of 2019," five years after their initial membership in the Pathways Program, "Plaintiffs discovered that Wyndham had the option to opt out of the Pathways Program and did not have to buy back their timeshare." (*Id.* at 107.) They do not state as much, but it may reasonably be presumed from the proposed Amended Complaint that they made this discovery when they attempted to exercise their sale option and WVR declined to buy back the plaintiffs' timeshare. Only then, the plaintiffs claim, did they begin to realize that Wyndham and its sales representatives might not have had the plaintiffs' best interests in mind during their years of dealing with them. (*Id.*) The plaintiffs began doing some internet research and discovered that others had had similar experiences with Wyndham. (*Id.*)

Elsewhere, the plaintiffs affirmatively allege that their reliance on the defendant's misrepresentations was reasonable. (*See, e.g.*, *id.* ¶ 164 ("Plaintiffs were reasonable to trust and have confidence in the integrity and fidelity of Defendants.").) They also allege that they were

pressured into the various upgrades they agreed to (*id* ¶¶ 45, 54), were encouraged by the Wyndham sales associates to make the purchases they did on the grounds that they were sound financial decisions (*id.* ¶ 46, 50, 56–57), and that the high pressure tactics confused the plaintiffs about what they were actually purchasing (*id.* ¶ 55). They claim that they were not provided sufficient opportunity to read through all the documents presented to them, that they were rushed through the execution of each agreement, and that the sales representatives "presented the contracts and closings in such a way as to deprive Plaintiffs the opportunity to understand fully and adequately the terms of the agreement." (*Id.* ¶¶ 87–90.) They claim that they were falsely advised that they could not rescind the contracts. (*Id.* ¶ 94.)

The question, of course, is whether these allegations are sufficient to defeat a motion to dismiss based on the statute of limitations. Under Tennessee law, "[a] defense predicated on the statute of limitations triggers the consideration of three components—the length of the limitations period, the accrual of the cause of action, and the applicability of any relevant tolling doctrines." *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 457 (Tenn. 2012). The length of the limitations period is usually "the most straightforward of the three elements," *id.*, and, indeed, as set forth above, the parties here do not dispute the length of the applicable limitations period. Further, it is clear from the face of the proposed Amended Complaint that the alleged misrepresentations occurred on May 21, 2015 and earlier (in some cases much earlier)— more than three years prior to the filing of the original Complaint on May 20, 2019.

Less clear is the date on which the plaintiffs' claims *accrued*. Accrual "relates to the date on which the applicable statute of limitations begins to run." *Redwing*, 363 S.W.3d at 457 (citation omitted). Under the so-called discovery rule, a cause of action accrues and the statute of limitations begins to run when the plaintiff has either actual or constructive knowledge of a claim. *Id.* at 459.

That is, the discovery rule does not allow the plaintiff to delay filing suit until he knows the full extent of his damages or the specific type of legal claim he has. *Id.* Constructive or "inquiry" notice occurs "when the plaintiff has actual knowledge of facts sufficient to put a reasonable person on notice that he or she has suffered an injury as a result of wrongful conduct." *Id.* (internal quotation and alteration omitted). In other words, "inquiry notice 'charges a plaintiff with knowledge of those facts that a reasonable investigation would have disclosed.'" *Id.* (quoting *Sherrill v. Souder*, 325 S.W.3d 584, 593 n.7 (Tenn. 2010)). Once the plaintiff "gains information sufficient to alert a reasonable person of the need to investigate the injury, the limitation period begins to run." *Id.*

Here, the plaintiffs appear to be claiming that their claims accrued within the limitations period or that the limitations period was tolled by the doctrine of fraudulent concealment. *Id.* at 459, 461. "Under the fraudulent concealment exception, the limitations clock pauses when 'the defendant has taken steps to prevent the plaintiff from discovering he was injured.'" *Chunn v. Se. Logistics, Inc.*, 794 F. App'x 475, 477 (6th Cir. 2019) (quoting *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 146 (Tenn. 2001)). "In a way, this is merely a variation on the discovery rule. How after all could a plaintiff discover his injury if the defendant fraudulently concealed it from him?" *Id.* (citing *Redwing*, 363 S.W.3d at 462).

"The heightened pleading standard of Civil Rule 9(b) applies to fraudulent concealment, just as it applies to the fraud itself." *Id.* (citations omitted). Thus, a plaintiff invoking the fraudulent concealment doctrine must allege and prove four elements:

> (1) that the defendant affirmatively concealed the plaintiff's injury or the identity of the wrongdoer or failed to disclose material facts regarding the injury or the wrongdoer despite a duty to do so; (2) that the plaintiff could not have discovered the injury or the identity of the wrongdoer despite reasonable care and diligence; (3) that the defendant knew that the plaintiff had been injured and the identity of the wrongdoer; and (4) that the defendant concealed material information from the plaintiff by withholding information or making use of some device to exclude suspicion or prevent inquiry.

*Id.* at 462–63 (footnotes, internal quotation marks and citations omitted). "The statute of limitations is tolled until the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered the defendant's fraudulent concealment or sufficient facts to put the plaintiff on actual or inquiry notice of his or her claim." *Redwing*, 363 S.W.3d at 463. "At the point when the plaintiff discovers or should have discovered the defendant's fraudulent concealment or sufficient facts to put the plaintiff on actual or inquiry notice of his or her claim, the original statute of limitations begins to run anew, and the plaintiff must file his or her claim within the statutory limitations period." *Id.*

The defendants assert, as set forth above, that the plaintiffs were put on notice of the alleged misrepresentations by the terms of the agreements themselves. The cases on which the defendants rely, however, are inapposite insofar as the plaintiffs there either did not allege or failed to present evidence of fraud. In *Pyburn*, for example, the plaintiff did not allege that he signed the contract as a result of fraud or that the defendant fraudulently misrepresented the terms of the contract (specifically, an arbitration provision). Instead, the evidence showed that the plaintiff simply had either never read the contract or did not remember reading it. The court stated, "If, *without being the victim of fraud*, a party 'fails to read the contract or otherwise to learn its contents, he signs the same at his peril . . . .'" *Pyburn*, 63 S.W.3d at 359 (quoting *Giles v. Allstate Ins. Co.*, 871 S.W.2d 154, 156 (Tenn. Ct. App. 1993)) (emphasis added); *accord Roopchan v. ADT Sec. Sys.*, 781 F. Supp. 2d 636, 650 (E.D. Tenn. 2011) (granting summary judgment to the defendant where the plaintiff alleged fraud but presented evidence of, at worst, innocent non-disclosure, stating: "if, *without being the victim of fraud* [the insured] fails to read the contract or otherwise to learn its contents, he signs the same at his peril and is estopped to deny his obligation, will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own

negligence." (quoting *Beasley v. Metro. Life Ins. Co.*, 229 S.W.2d 146, 148 (Tenn. 1950));
*Bowman v. Waggoner*, No. M2004-00411-COA-R3-CV, 2006 WL 140377, at *4 (Tenn. Ct. App.
Jan. 17, 2006) (affirming directed verdict for the defendant on a fraudulent inducement claim
where the plaintiff failed to present evidence that the defendant intentionally tried to deceive or
mislead him).

The Sixth Circuit, however, applying Tennessee law, has recognized that fraudulent
representations that conflict with the clear written terms of a contract may support fraud-based
claims. *See Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566–67 (6th Cir. 2003). The court there
also held that, under Tennessee law, the parol evidence rule does not apply to allegations of
fraudulent misrepresentations inducing a party to enter into a contract, because fraud claims
"sound[] in tort, not contract." *Id.* at 567 (citing *Brungard v. Caprice Records*, 608 S.W.2d 585,
588 (Tenn. Ct. App. 1980); *Steed Realty v. Oveisi*, 823 S.W.2d 195, 202 (Tenn. Ct. App. 1991));
*see also Kolstad v. Leehar Distributors, LLC*, No. 3:18-CV-00060, 2018 WL 6832086, at *4 (M.D.
Tenn. Dec. 28, 2018) (Richardson, J.) (recognizing some "inconsistencies in the application of
parol evidence rule to claims involving allegations of fraud" in Tennessee caselaw, but nonetheless
concluding that "the better interpretation of Tennessee case law, and the one that the Tennessee
Supreme Court likely would articulate at this time, is that the parol evidence rule will not bar
evidence of claims involving allegations of fraud that sound in tort" (citations omitted)). In *Shah*,
the Sixth Circuit further held that, while a promissory fraud claim required reasonable reliance,
"there is no rule that a merger clause makes reliance on oral representations unreasonable *per se*
so as to necessarily defeat a fraudulent inducement or promissory fraud claim." 338 F.3d at 568.
There, despite the fact that the contract contained express terms conflicting with the pre-contract

promise made by the defendant regarding its ability to terminate the contract, the court denied summary judgment on the plaintiff's promissory fraud claim.[6]

In this case, specifically with respect to the plaintiffs' participation in the Pathways Program and their understanding that they would have the option, after five years, to sell back their timeshares to WVR, the court finds that, at this stage in the proceedings, the plaintiffs have adequately alleged fraudulent misrepresentations and fraudulent promises of future performance upon which they reasonably relied, to their detriment, and that, despite doing "due diligence," they did not discover the fraud until May of 2019, when WVR declined the buy-back option. The reasonableness of their reliance and of their failure to discover the fraud at an earlier date is a question of fact. *Gerdau Ameristeel, Inc. v. Ratliff*, 368 S.W.3d 503, 509 (Tenn. 2012). At this stage, the court will presume that their reliance was reasonable and that their fraud claim based on express representations that WVR would buy back the timeshares did not accrue, or that the statute of limitations was tolled, until May 2019, for purposes of both the common law fraud claims and the TTSA claim.

---

[6] The Sixth Circuit articulated the elements of a fraud and promissory fraud claim as follows:

(1) an intentional misrepresentation with regard to a material fact,

(2) knowledge of the misrepresentation [sic] falsity—that the representation was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity,

(3) that the plaintiff reasonably relied on the misrepresentation and suffered damage, and

(4) that the misrepresentation relates to an existing or past fact, or if the claim is based on promissory fraud, then the misrepresentation must embody a promise of future action without the present intention to carry out the promise.

*Shah*, 338 F.3d at 566–67 (citations omitted). The plaintiffs' claim in the present case appears to sound in promissory fraud, as it is premised upon a promise to buy back the plaintiffs' time shares in the future.

However, insofar as the plaintiffs seek to base their fraud claims upon any representations made at the sales presentation in 2008 or earlier, any such claims are clearly time-barred. Likewise, any fraud claims based on statements or omissions made during the 2014 and 2015 sales presentations *other* than those relating to WVR's buy-back obligation are time-barred. The plaintiffs specifically allege that they were aware of misrepresentations related to increasing annual maintenance, assessment, and other fees and the other issues they identify, such as difficulties in making reservations and the condition of the available facilities, well before they entered into the 2014 agreements. Indeed, they raised many of these issues during the 2014 sales presentation. (*See also* Doc. No. 19-1 ¶ 98 (increasing maintenance and assessment fees beginning in 2001); *id.* ¶ 100 (plaintiffs complained about maintenance fees and difficulties making reservations at 2008 sales presentation); *id.* (plaintiffs began incurring even higher maintenance fees after 2008 purchase and soon discovered that they had not, as they had thought, purchased a "fixed-location ownership in Nashville"); *id.* ¶ 101 (plaintiffs experienced unexpected use fees in June 2014); *id.* ¶ 102 (plaintiffs complained about maintenance fees in September 2014 sales presentation).

The proposed Amended Complaint contains no additional factual allegations about these other issues, other than to state that, during the plaintiffs' "most recent vacation" in June or July 2018, they were "required to pay fees and assessments that non-owners were not required to pay." (*Id.* ¶ 105.) They do not allege affirmative misrepresentations regarding such fees during the 2014 or 2015 sales presentations. More to the point, they also do not allege that this was their *only* vacation following those presentations—only that it was the most recent—perhaps to bolster a "continuing violation" theory to extend the running of the statute of limitations. This effort is

fruitless under the circumstances, because the plaintiffs do not allege continuing misrepresentations or that they could not have discovered problems with fees and bookings earlier.

Thus, to the extent that the plaintiffs intend to premise their fraud claims on alleged misrepresentations relating to whether they were purchasing a fixed-location ownership, difficulties booking reservations, whether the plaintiffs could rent their timeshare to pay for maintenance fees or to cover the mortgage, and the availability and condition of the timeshares at which they sought or actually made reservations, any such claims are time-barred. The allegations in the proposed Amended Complaint show that the plaintiffs had actual or constructive knowledge of all of these issues well before May 2015, for purposes of both their common law claims and TTSA claim. Nor does the proposed Amended Complaint allege facts affirmatively showing fraudulent concealment of any of these issues.

In sum, the only fraud-based claims that are not clearly time-barred, either by Tennessee's three-year statute of limitations relating to the common law fraud claims or the four-year limitation period relating to the TTSA claim, are those related to alleged representations made in 2014 and 2015 regarding WVR's buy-back obligation under the Pathways Program.

### 3.    *Negligent Misrepresentation*

The court previously dismissed the negligent misrepresentation claim, without prejudice, on the ground that it was barred by the statute of limitations. The defendants assert that the proposed Amended Complaint does not contain any new facts that would warrant a contrary conclusion.

To state a claim for negligent misrepresentation, a plaintiff must show that the defendant was (1) acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary interest; (2) supplied false information to the plaintiff meant to guide him or others in their business transactions; (3) did not exercise reasonable care in obtaining or

communicating the information; and (4) that the plaintiff justifiably relied on the information. *Homestead Grp., LLC v. Bank of Tenn.*, 307 S.W.3d 746, 751 (Tenn. Ct. App. 2009) (citing *Walker v. Sunrise Pontiac–GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008)). "A cause of action accrues for either intentional or negligent misrepresentation when a plaintiff discovers, or in the exercise of reasonable care and diligence, should have discovered, his injury and the cause thereof. The statute is tolled only during the period when the plaintiff has no actual or constructive knowledge of the alleged wrong." *Ne. Knox Util. Dist. v. Stanfort Constr. Co.*, 206 S.W.3d 454, 459 (Tenn. Ct. App. 2006) (internal quotation marks and citations omitted).

The plaintiffs allege negligent misrepresentation in the alternative to their claim of intentional misrepresentation. The court finds, for the same reasons as those pertaining to the intentional misrepresentation claims, that the proposed amendment of the negligent misrepresentation claim is not futile only insofar as it relates to WVR's buy-back obligation, regarding which the plaintiffs allege they did not have actual or constructive notice until May 2019. Otherwise, the plaintiffs had actual or constructive notice of any other alleged misrepresentations well before May 2016, as a result of which any such claims are time-barred.

### B.      Breach of Contract

The court granted the motion to dismiss the breach of contract claims in the original Complaint, finding that the assertions in the Complaint under the heading for Count VII, "Breach of Contract," amounted to no more than the "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" that do not suffice to state a claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court explained that the elements of breach of contract in Tennessee required the formation of an enforceable contract, a non-performance amounting to a material breach of that contract, and resulting damages. *See, e.g.*, *Nw. Tenn. Motorsports Park, LLC v. Tenn. Asphalt Co.*, 410 S.W.3d 810, 816–17 (Tenn. Ct. App. 2011). The

court further found that the Complaint failed to "identify any particular contractual obligation that any particular defendant failed to satisfy or link such breach to damages" and, therefore, did not "plead factual content that permits the reasonable inference that the defendants breached any of the parties' written contracts" or "allege the formation of any oral contracts, much less their breach." (Doc. No. 15, at 19.)

The proposed Amended Complaint does not contain any new factual allegations establishing the breach of any written agreement or the creation (or breach) of any oral agreement. Regarding the latter, specifically, under Tennessee law, the creation of an enforceable contract requires "a meeting of the minds in mutual assent to terms"; it must be based on "sufficient consideration [and] free from fraud or undue influence, not against public policy and . . . sufficiently definite to be enforced." *Russell Barnett Ford of Tullahoma, Inc. v. H & S Bakery, Inc.*, 398 F. Supp. 3d 287, 295 (E.D. Tenn. 2019) (quoting *Jones v. LeMoyne-Owen Coll.*, 308 S.W.3d 894, 904 (Tenn. Ct. App. 2009). Although the proposed Amended Complaint contains vague references to the breach of oral agreements, the plaintiffs allege none of the requisite elements to show the creation of an enforceable oral agreement in the first place.

Instead, they claim that the defendants' agents made false representations about what the contracts the plaintiffs signed actually said or made promises that they never intended to keep, that the plaintiffs were not told all of the "terms and conditions" of the programs they entered into, that they were "misled, pressured, and/or bullied" into making purchase decisions and signing contracts without being given the opportunity to review the deals, discuss them among themselves, or consult with legal or financial counsel. (Doc. No. 19-1 ¶ 85.) They allege that the sales representatives intentionally or negligently made false statements about Wyndham's programs to induce the plaintiffs to make the timeshare purchases and that they were not given "the opportunity

to understand fully and adequately all the terms of the agreement[s]" they signed. (*Id.* ¶ 90.) None of these allegations implies the formation of any oral contract through a meeting of the minds in assent to terms that were sufficiently definite to be enforced.

Regarding the written contracts, the existence of which is clearly alleged, the plaintiffs do not allege that any breach occurred. Instead, they argue that they were fraudulently induced to enter contracts without a full understanding of their terms. Under Tennessee law, "[a]n individual induced by fraud to enter into a contract may elect between two remedies. He may treat the contract as voidable and sue for the equitable remedy of rescission or he may treat the contract as existing and sue for damages at law under the theory of deceit in the ordinary case." *Justice v. Anderson Cty.*, 955 S.W.2d 613, 616 (Tenn. Ct. App. 1997). "The former is a contract action, while the latter is grounded in tort." *Id.* (citing *Vance v. Schulder*, 547 S.W.2d 927, 931 (Tenn. 1977)). A plaintiff "may argue fraud in the alternative to [his or her] breach of contract claims; however, stating a cause of action for fraud does not establish breach of contract." *Furnco, LLC v. Laneventure, Inc.*, No. 07-2333, 2009 WL 10699902, at *7 (W.D. Tenn. Aug. 14, 2009). In this case, the plaintiffs have not treated the contracts as voidable and they do not seek rescission. Instead, they seek to enforce the contracts, despite failing to allege a breach thereof. In the alternative, they bring fraud claims. They request "compensatory, treble and punitive damages," and unspecified injunctive and declaratory relief." (Doc. No. 19-1, at 29.) In other words, they have elected the remedy of suing for damages under a theory of deceit, rather than suing for rescission. Their fraud claims, standing alone, are not sufficient to also state a claim for breach of contract.

Moreover, under "Count VII," the proposed Amended Complaint, again, offers only the bare outline of a breach of contract claim—the threadbare recitals of the elements of the cause of action referenced by *Iqbal*. It asserts that the "Defendants entered into a contract with Plaintiffs

containing oral and written promises, obligations, and duties," that the plaintiffs paid monetary consideration, that the "Defendants" had a duty to meet their obligations under the "oral and written contracts," and that, "[a]s outlined above, Defendants breached those duties." (Doc. No. 19-1 ¶¶ 199–202.) These averments do not satisfy *Iqbal*, and, as indicated above, the factual allegations elsewhere in the proposed Amended Complaint do not fill in the blanks.

In sum, the proposed Amended Complaint fails to allege facts that, if true, would establish the formation of an oral contract or the breach of a written contract. It does not assert that the written contracts are voidable or seek rescission thereof. Under these circumstances, the proposed Amended Complaint does not state colorable contract-based claims, and the proposed amendment is futile insofar as it incorporates a claim for breach of contract.

### C. Unjust Enrichment

As the court previously explained, the elements of an unjust enrichment claim are: "1) [a] benefit conferred upon the defendant by the plaintiff; 2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (citation and internal quotation marks omitted). "Unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist." *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998) (citing *Paschall's Inc. v. Dozier*, 407 S.W.2d 150, 154–55 (Tenn. 1966). "Courts will impose a contractual obligation under an unjust enrichment theory when: (1) there is no contract between the parties or a contract has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation." *Id.* (citation omitted). "A contract cannot be implied, however, where a valid contract exists on the same subject matter." *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991). Thus,

a party seeking to recover under a theory of unjust enrichment "must demonstrate . . . [that] there [is] no existing, enforceable contract between the parties covering the same subject matter." *Smith v. Hi-Speed, Inc.*, 536 S.W.3d 458, 480 (Tenn. Ct. App. 2016) (citation omitted).

The court previously found that the allegations in the original Complaint supporting the unjust enrichment claim were as "vague and conclusory as [those] supporting breach of contract." (Doc. No. 15, at 21.) The proposed Amended Complaint fares little better. The elements recited under "Action for Unjust Enrichment" have not been amended, and the plaintiffs have not explained the basis for the claim other than broadly incorporating "the allegations in the foregoing paragraphs 1 through 107." (Doc. No. 19-1 ¶ 204.)

Under Tennessee law, a party may plead conflicting claims in the alternative, and fraud may provide a basis for rescission of a contract. *See Green v. YMCA of Memphis*, No. W2014-02190-COA-R3-CV, 2015 WL 6736705, at *4 (Tenn. Ct. App. Nov. 4, 2015) ("Generally speaking, rescission is appropriate when a party has been induced to enter into a contract by fraud, duress or undue influence. It is also appropriate in other limited situations." (citation omitted)); *Atkins v. Kirkpatrick*, 823 S.W.2d 547, 552 (Tenn.Ct.App.1991) ("Fraudulent misrepresentation can be a ground for the rescission of a contract."). As indicated above, however, the plaintiffs here do not request rescission, and they do not contest the existence of express written contracts. Regardless of the fact that the unjust enrichment claim has been pleaded in the alternative to the breach of contract claim, the court finds that the proposed Amended Complaint fails to state a colorable claim for unjust enrichment and is futile with respect to this claim.

## V.    CONCLUSION

For the reasons forth herein, the Motion to Amend will be granted in part and denied in part. The proposed amendment is futile insofar as it continues to assert claims against any Wyndham defendant other than WVR. It is also futile insofar as it attempts to assert claims against

WVR for breach of contract, unjust enrichment, and any misrepresentation claims, whether intentional or negligent, except those related to alleged representations made in September 2014 and May 2015 concerning WVR's buy-back obligation under the Pathways Program. The plaintiffs will be permitted to file the proposed Amended Complaint, but all other claims against all other Wyndham defendants will nonetheless remain dismissed.[7]

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge

---

[7] The John Doe defendants have never been served, and no motion to dismiss the claims against those defendants has been filed, so all claims against these defendants remain pending.